UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

EUREKA DIVISION

NICHOLAS N.,[1]

    Plaintiff,

v.

MARTIN O'MALLEY,

    Defendant.

Case No. 22-cv-03898-RMI

**ORDER RE: CROSS MOTIONS FOR SUMMARY JUDGMENT**

Re: Dkt. Nos. 20, 21

Plaintiff seeks judicial review of an administrative law judge ("ALJ") decision denying his application for disability insurance benefits under Title II of the Social Security Act. *See* Admin. Rec. at 1.[2] The Appeals Council of the Social Security Administration declined to review the ALJ's decision. *Id*. As such, the ALJ's decision is a "final decision" of the Commissioner of Social Security, appropriately reviewable by this court. *See* 42 U.S.C. §§ 405(g), 1383(c)(3). Both parties have consented to the jurisdiction of a magistrate judge (dkts. 6, 10) and both parties have moved for summary judgment (dkts. 20, 21). For the reasons stated below, Plaintiff's Motion for Summary Judgment is granted in part and denied in part, and Defendant's Motion for Summary Judgment denied.

**LEGAL STANDARDS**

The Social Security Act limits judicial review of the Commissioner's decisions to final

---

[1] Pursuant to the recommendation of the Committee on Court Administration and Case Management of the Judicial Conference of the United States, Plaintiff's name is partially redacted.

[2] The Administrative Record ("AR"), which is independently paginated, has been filed in eight attachments to Docket Entry #15. *See* (Dkts. 15-1 through 15-8).

decisions made after a hearing. 42 U.S.C. § 405(g). The Commissioner's findings "as to any fact, if supported by substantial evidence, shall be conclusive." *Id.* A district court has limited scope of review and can only set aside a denial of benefits if it is not supported by substantial evidence or if it is based on legal error. *Flaten v. Sec'y of Health & Human Servs.*, 44 F.3d 1453, 1457 (9th Cir. 1995). The phrase "substantial evidence" appears throughout administrative law and directs courts in their review of factual findings at the agency level. *See Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019). Substantial evidence is defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* at 1154 (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)); *see also Sandgathe v. Chater*, 108 F.3d 978, 979 (9th Cir. 1997). "In determining whether the Commissioner's findings are supported by substantial evidence," a district court must review the administrative record as a whole, considering "both the evidence that supports and the evidence that detracts from the Commissioner's conclusion." *Reddick v. Chater*, 157 F.3d 715, 720 (9th Cir. 1998). The Commissioner's conclusion is upheld where evidence is susceptible to more than one rational interpretation. *Burch v. Barnhart*, 400 F.3d 676, 679 (9th Cir. 2005).

**SUMMARY OF THE RELEVANT EVIDENCE**

A. *Medical History*

Plaintiff has exhibited signs of psychiatric and neurocognitive disorders from a young age. *See e.g.,* AR at 48, 57, 70. In 1984, when Plaintiff was four, he was diagnosed with attention deficit hyperactive disorder ("ADHD"). *Id.* at 57. At five, Plaintiff went on a trial of Cylert to help regulate his behavior, which included physical aggression with his family members. *Id.* At seven, Plaintiff was diagnosed with bipolar disorder and was hospitalized for treatment. *Id.* at 49. He was in the hospital for a week. *Id.* Plaintiff was again diagnosed with "rapid cycling bipolar disorder" and ADHD at age ten. *See* AR at 56.

In 1998, at seventeen, Plaintiff continued to suffer from "out-of-control daily anger spells" after which he would be "tearful and sleep for hours." *Id.* at 48. Plaintiff's physician, Dr. Schreir, reported "brief episodes of anger and sadness" which were "sometimes…associated with suicidal ideation." *Id.* That year, Plaintiff was diagnosed with Asperger's syndrome, pervasive

2

developmental disorder with secondary affective dysregulation, and generalized anxiety disorder by physicians at the UCLA Neuropsychiatric Institute ("NPI"). *Id.* at 50-51. NPI's 1998 report is ambiguous as to Plaintiff's bipolar disorder. On one hand, there is evidence of some skepticism as to whether bipolar disorder properly accounted for Plaintiff's symptoms. *See id.* at 51. However, on discharge, NPI did not explicitly "rule out" bipolar disorder, a tact they took for three other disorders. *Id.* at 52.

Plaintiff has a long history of social difficulties, including difficulty making and keeping friends, responding appropriately to his peers, and difficulty leaving the house without a family member. *See e.g.*, *id.*, at 48. Throughout his child- and early adulthood, Plaintiff required non-traditional educational settings, including small, structured classrooms, day treatment centers, residential schools, special education programs, and homeschooling. *See id.*, at 57-58. He attended the Regional Center of the East Bay in 1999 and the Deveroux School from 2000 to 2002. *Id* at 46. In 2002, Plaintiff was discharged from Deveroux to the Tumbleweed Group Home, and subsequently, in 2004, to the Diana Ferro Group Home. *Id.* At these institutions, Plaintiff was treated primarily for schizoaffective disorder and Asperger's syndrome. *Id.* at 893, 905, 1372. Plaintiff's schizoaffective disorder is referenced in the record as recently as 2018 (*Id.* at 905), although details about this diagnosis are scarce. However, Plaintiff has been diagnosed with schizoaffective disorder at least twice (*Id.* at 893, 904) and there is evidence that Plaintiff suffered from hallucinations and/or delusions, (*Id.* at 866, 903, 1417).

As a child, Plaintiff's anger outbursts were severe. *See e.g.*, *id.*, at 862 (describing an instance where Plaintiff threw a chair at a TV); AR at 864 (noting that Plaintiff "become[s] very aggressive and agitated"); *Id.* at 860, (noting that Plaintiff was hospitalized for aggressive behavior with family members). Plaintiff's regulation of his emotions appears to have improved since then, with the help of medication and behavioral therapy. *See e.g.*, *id.* at 893-896 (detailing, in 2001, that "[Plaintiff] does not resort to swearing or physical aggressiveness"); *Id.* at 990 (noting, in 2016, that Plaintiff sought to regain control of SSI funds, and reported his moods "ha[ve] been stable."). However, there is also evidence, including Plaintiff's testimony, and the observations of his father and sister, that he continues to struggle with managing his anger and

3

depression even while on medication. *See id.* at 925 (hospital records recording that, in 2018, Plaintiff was treated for a sprained wrist, where cause of injury was punching a wall); *Id.* at 119 (Plaintiff testifying that, with respect to his anger, "Even with the medication, it's hard to control things sometimes. Very difficult."); *Id.* at 111 (Plaintiff testifying that he "used to hit walls and things" but now just gets "verbally angry" about "anything and everything" including yelling and swearing a few times a week, and that bipolar is "hard to live with. [I]t can just kind of come out of nowhere…."); *Id.* at 95 (Plaintiff's father testifying that Plaintiff "blows up" and becomes "irrational and uncontrollable"); *Id.* at 164 (noting that Plaintiff's sister reports Plaintiff is dependent and "explosive"). Plaintiff attributes much of his inability to hold a job to anger spells, anxiety, lack of focus, and depression. *Id.* at 111, 119.

In 1997 and 1998, prior to his time at the Deveroux school and subsequent group homes, Plaintiff worked for short periods at McDonalds and KFC. *Id.* at 46. He lasted three weeks at both companies. *Id.* In 2005, Plaintiff worked at Safeway as a courtesy clerk for about a year. *Id.* at 111. Plaintiff testified that, while at Safeway, he would yell and swear at his supervisors a few times a week. *Id.* According to Plaintiff, his managers told him that if he did not control his anger, he would be fired. *Id.*

While working at Safeway, Plaintiff injured his back, and left his position because of this injury. *Id.* at 71. In 2006, Plaintiff's back injury also led to his release from employment at Target, where he was a security guard. *Id.* at 46. To date, Plaintiff's back injury continues to affect his ability to work. *Id.* at 22, 25. He has been diagnosed with degenerative disc disease, sees a chiropractor once a week for adjustments, and sometimes walks with a cane. *Id.* at 22.

Plaintiff's treatment of his mental health disorders waned in his late 20s. *See id.* at 875, 992, 1021, 1326. He continued to take medication to help with his bipolar disorder and ADHD but stopped seeing a psychiatrist or psychologist regularly. *See id.* Plaintiff received repeated requests from his primary care physicians that he seek out a psychiatrist (*see e.g.*, *id.* at 992 (noting patient "seems stable" but "needs to see a psychiatrist on a regular basis"); *Id.* at 1326 (Plaintiff "needs to see a psychiatrist")) and there is evidence in the record that suggests Plaintiff had difficulty scheduling and obtaining access to psychiatric care (*Id.* at 875, 1021).

More recently, Plaintiff was diagnosed with autism, or "history of Autistic Spectrum Disorder." *Id.* at 1434. Plaintiff and his family appear to agree that autism is a more accurate diagnosis than Asperger's syndrome. *Id.* at 19. Neither Plaintiff nor his family have given any indication that the autism diagnosis supplants his bipolar or schizoaffective diagnoses. Additional diagnoses of generalized anxiety disorder, major depressive disorder, and evidence of depression generally, also appear in Plaintiff's recent medical history. *See e.g.*, *id.* at 81, 1434.

B. *Procedural History*

On August 6, 2018, Plaintiff filed an application for Title II benefits alleging an onset date of November 1, 1998. AR at 424-25. Plaintiff's first hearing before an ALJ was on October 25, 2019, after which the ALJ denied Plaintiff's application, finding he was not disabled. Pl.'s Mot. (Dkt. 20) at 3. Plaintiff appealed, and the Appeals Council reviewed the decision and remanded for further proceedings. *Id.* Plaintiff's second hearing before an ALJ took place on April 29, 2021, and the ALJ's decision was issued in July of 2021, again denying Plaintiff's application for benefits. *Id.* Plaintiff appealed, but the Appeals Council declined to review the ALJ's decision. *Id.* A few months later, Plaintiff sought review in this court (*see* Compl. (dkt. 1) at 4) and the instant case was initiated.

**THE FIVE STEP SEQUENTIAL ANALYSIS FOR DETERMINING DISABILITY**

A person filing a claim for social security disability benefits ("the claimant") must show that he has the "inability to do any substantial gainful activity by reason of any medically determinable impairment" which has lasted or is expected to last for twelve or more months. *See* 20 C.F.R. §§ 416.920(a)(4)(ii), 416.909. The ALJ must consider all evidence in the claimant's case record to determine disability (*see id.* at § 416.920(a)(3)) and must use a five-step sequential evaluation process to determine whether the claimant is disabled. *Id.* at § 416.920; *see also id.* at § 404.1520. While the claimant bears the burden of proof at steps one through four (*see Ford v. Saul*, 950 F.3d 1141, 1148 (9th Cir. 2020)), "the ALJ has a special duty to fully and fairly develop the record and to assure that the claimant's interests are considered." *Brown v. Heckler*, 713 F.2d 441, 443 (9th Cir. 1983). Here, the ALJ appropriately set forth the applicable law regarding the required five-step sequential evaluation process. AR at 17-18.

5

1	At step one, the ALJ must determine if the claimant is presently engaged in "substantial
2	gainful activity" (20 C.F.R. § 404.1520(a)(4)(i)), which is defined as work done for pay or profit
3	and involving significant mental or physical activities. *See Ford*, 950 F.3d at 1148. Here, the ALJ
4	determined that Plaintiff had not performed substantial gainful activity during the relevant period.
5	AR at 18.

6	At step two, the ALJ decides whether the claimant's impairment (or combination of
7	impairments) is "severe" (*see* 20 C.F.R. § 404.1520(a)(4)(ii)), "meaning that it significantly limits
8	the claimant's 'physical or mental ability to do basic work activities.'" *Ford*, 950 F.3d at 1148
9	(quoting 20 C.F.R. § 404.1522(a)). If no severe impairment is found, the claimant will not be
10	found to be disabled. 20 C.F.R. § 404.1520(c). Here, the ALJ determined that Plaintiff had the
11	following severe impairments: generalized anxiety disorder; history of attention deficit
12	hyperactivity disorder (ADHD); dependent personality disorder; degenerative disc disease of the
13	lumbar spine impacting the back and neck; and a history of autistic spectrum disorder. AR at 19.
14	The ALJ found that Plaintiff's other impairments—schizoaffective disorder, pervasive
15	developmental disorder, OCD, and bipolar disorder—were "not medically determinable
16	impairments due to a lack of requisite evidence." *Id.*

17	At step three, the ALJ is tasked with evaluating whether the claimant has an impairment or
18	combination of impairments that meet or equal an impairment in the "Listing of Impairments." *See*
19	20 C.F.R. § 404.1520(a)(4)(iii); 20 C.F.R. Pt. 404 Subpt. P, App. 1. The listings describe
20	impairments that are considered sufficiently severe as to prevent any individual so afflicted from
21	performing any gainful activity. *Id.* at § 404.1525(a). Each impairment is described in terms of
22	"the objective medical and other findings needed to satisfy the criteria in that listing." *Id.* at §
23	404.1525(c)(3). For a claimant to show that his or her impairment matches a listing, it must meet
24	all the specified medical criteria—an impairment that manifests only some of those criteria, no
25	matter how severely, does not "meet" that listing. *See Sullivan v. Zebley*, 493 U.S. 521, 530
26	(1990). If an impairment either meets the listed criteria, or if one or more impairments are
27	determined to be medically equivalent to the severity of that set of criteria, that person is
28	conclusively presumed to be disabled without a consideration of age, education, or work

6

experience. *See* 20 C.F.R. § 404.1520(d). Here, the ALJ determined that Plaintiff did not have an impairment or combination of impairments that meets or equals the criteria or severity of any of the listings. AR at 19.

If a claimant does not meet or equal a listing, the ALJ must formulate the claimant's residual functional capacity ("RFC"), which is defined as the most that a person can still do despite the limitations associated with their impairment. *See* 20 C.F.R. § 404.1545(a)(1). Here, the ALJ determined that Plaintiff retained the ability to perform light work with the following limitations: Plaintiff can occasionally lift or carry twenty pounds and frequently lift or carry ten pounds; he can stand or walk for one hour at a time for a total of six hours; he can sit for one hour at a time for a total of six hours in an eight-hour workday; he would need to be able to alternate positions after each of these activities; he can frequently extend and rotate his neck; he is able to perform simple repetitive tasks; he needs to primarily work alone; he can tolerate occasional contact with coworkers and incidental contact with the public; he needs to work in an environment where he does not have any time-based production quotas and where there are no sudden changes in work duties; and he cannot perform retail work. AR at 21.

Following the formulation of the RFC, the ALJ must determine—at step four—whether the claimant can perform his past relevant work, which is defined as "work that [the claimant has] done within the past 15 years, that was substantial gainful activity, and that lasted long enough for [the claimant] to learn to do it." *See* 20 C.F.R. § 404.1560(b)(1). If the ALJ determines, based on the RFC, that the claimant can perform his past relevant work, the claimant will not be found disabled. *Id.* at § 404.1520(f). Otherwise, at step five, the burden shifts to the agency to prove that the claimant can perform a significant number of jobs that are available in the national economy. *See Ford*, 950 F.3d at 1149. To meet this burden, the ALJ may rely on the Medical-Vocational Guidelines (commonly referred to as "the grids") (20 C.F.R. Pt. 404 Subpt. P, App. 2); or, alternatively, the ALJ may rely on the testimony of a Vocational Expert ("VE"). *Ford*, 950 F.3d at 1149 (citation omitted). A VE may offer expert opinion testimony in response to hypothetical questions about whether a person with the physical and mental limitations imposed by the claimant's medical impairment(s) can meet the demands of the claimant's previous work, either as

the claimant actually performed it or as generally performed in the national economy, or the demands of other jobs that may be available in the national economy. *See* 20 C.F.R. § 404.1560(b)(1). An ALJ may also use other resources for this purpose, such as the Dictionary of Occupational Titles ("DOT"). *Id.*

At step four, the ALJ determined that Plaintiff has no past relevant work. AR at 28. At step five, based on a VE's testimony, the ALJ determined that Plaintiff can perform the requirements of representative occupations such as a garment sorter, a price marker, or a routing clerk. *Id.* at 29. Accordingly, the ALJ determined that Plaintiff was not disabled at any time during the relevant period. *Id.* at 30.

## DISCUSSION

### A. *The ALJ's Assessment of Dr. Ionascu's Opinion*

Plaintiff argues that the ALJ used the wrong legal standard to evaluate Dr. Ianoscu's opinion. Pl.'s Mot. (Dkt. 20) at 5-8. Plaintiff asserts that, when determining the persuasiveness of a medical opinion, an ALJ must first make a finding that two or more medical experts' opinions are equally compelling with respect to the factors of supportability and consistency before addressing any other factors, such as the physician's relationship with the claimant. *See id.* at 7. To support his argument, Plaintiff points to § 404.1520c(b)(3) of the Secretary's regulations. *Id.* The court finds that Plaintiff's reading of the regulations is incorrect.

Section 404.1520c of the Secretary's regulations addresses how an ALJ will consider and articulate medical opinions.[3] 20 C.F.R. § 404.1520c. The section outlines five factors—supportability, consistency, relationship with the claimant, specialization, and "other factors"—which an ALJ may consider, as appropriate, to determine the persuasiveness of a medical opinion. § 404.1520c(a)-(c). Although the regulations do establish that the most important factors are supportability and consistency, they do not limit an ALJ's ability to consider any of the five factors. *See* § 404.152c(a) ("we will consider [] medical opinions…using the [five factors listed in this section], as appropriate.").

---

[3] This section applies only to applications for benefits filed after 2017. 20 C.F.R. § 404.1520c.

8

Plaintiff's confusion arises from subsection (b), which the court will take a moment to explain. Section 404.152c(b) outlines an ALJ's duty to articulate his or her considerations in an administrative decision. The court emphasizes that what an ALJ is permitted to *consider* is covered in subsection (a); what the ALJ must *articulate* is covered in subsection (b). Under subsection (b), an ALJ must always articulate his or her assessment of a medical opinion's supportability and consistency, as these are the "most important factors." § 404.152c(b)(2). As to the other three factors, an ALJ may, but need not, articulate how he or she considered them. *Id.* However, if the ALJ finds two or more medical opinions equally persuasive on the same issue, in terms of supportability and consistency, then the ALJ must articulate how they considered the other three factors. § 404.152c(b)(3).

Plaintiff appears to be reading subsection (b)(3) in isolation, and thus, finds a limit on an ALJ's ability to consider factors other than supportability and consistency where there is none. Subsection (b)(3) simply addresses when an ALJ *must articulate* factors other than supportability and consistency; it does not address when the ALJ *may consider* the other factors. *See id.* That discretion is preserved in subsections (a) and (b)(2). Here, the ALJ did not find Dr. Ionascu's opinion equally persuasive with any other physician's, and, as such, was not required to articulate her consideration of the other factors. The ALJ retained the discretion to do so under § 404.1520c(a) and (b)(2), and thus, it was not a violation of the regulations when she considered and articulated Dr. Ionascu's relationship with Plaintiff.

B.  *The ALJ's Assessment of Dr. Ionascu's Opinion*

Plaintiff's second argument amounts to an assertion that the ALJ did not base her assessment of Dr. Ionascu's opinion on substantial evidence. *See* Pl.'s Mot. (dkt. ) at 8-10. Because, as explained below, the court finds that the ALJ erred at step two and remands on these grounds, it is unnecessary to address Plaintiff's concerns regarding Dr. Ionascu's opinion. *See Hiler v. Astrue*, 687 F.3d 1208, 1212 (9th Cir. 2012) ("Because we remand the case to the ALJ for the reasons stated, we decline to reach [Plaintiff's] alternative ground for remand."); *Steven M. v. Saul*, No. 19-cv-06991-RMI, 2021 WL 1056787, at *5 (N.D. Cal Mar. 19, 2021). On remand, the

9

ALJ is ORDERED to consider the issues raised in Plaintiff's briefing and to modify any ensuing opinion to the extent necessary.

C. *The ALJ's Step Two Analysis*

As mentioned above, at step two of the disability evaluation analysis, the ALJ omitted bipolar disorder and schizoaffective disorder as severe impairments after finding that the diagnoses "were not medically determinable due to lack of requisite evidence." AR at 19. The ALJ based this conclusion on the testimony of Dr. Anderson, the SSA's medical expert. *Id.*

The court finds three errors with the ALJ's disposal of bipolar disorder and schizoaffective disorder at step two. First, Dr. Anderson's testimony is contradicted by the record. Second, the ALJ and Dr. Anderson wrongly dismissed Plaintiff's multiple diagnoses of bipolar disorder and schizoaffective disorder as unacceptable medical evidence. Third, the ALJ failed to develop the record by ignoring significant ambiguities in the record due to the absence and illegibility of certain medical records. The court will address these errors in turn.[4]

Step two of the SSA's evaluation process requires the ALJ to determine if the claimant has a medically severe impairment or combination of impairments. 20 C.F.R. § 404.1520(a)(4)(ii). This evaluation is a *de minimis* test intended to weed out patently groundless claims and the most minor of impairments. *See Bowen v. Yuckert*, 482 U.S. 137, 153-154 (1987); *Edlund v. Massanari*,

---

[4] Although no party has raised a step two error or asserted that the ALJ failed to properly develop the record, the court can, and should, raise and address those issues *sua sponte* because the court has an independent duty to determine whether the ALJ's findings (in every regard) are supported by substantial evidence—and to take any consequentially necessary action. *See Sims v. Apfel*, 530 U.S. 103, 110 (2000) (explaining that an appeal from the denial of Social Security benefits is quite unlike ordinary civil litigation because the underlying claims process before the ALJ is not adversarial). While claimants must carry the burden of demonstrating that they qualify for benefits, the law does not leave them entirely to their own devices; as such, lapses and omissions in pleading or procedure cannot be relied upon to withhold or delay benefits from a claimant who may otherwise be entitled to them. *See Tackett v. Apfel*, 180 F.3d 1094, 1098 n.3 (9th Cir. 1985). Thus, the failure by Plaintiff or her counsel to raise an error is not an acceptable reason for a court to actively ignore it. *See Ariz. State Dep't of Pub. Welfare v. Dep't of Health, Educ. & Welfare*, 449 F.2d 456, 472 (9th Cir. 1971); *Hess v. Sec'y of Health, Educ. & Welfare*, 497 F.2d 83,840 (3d Cir. 1974); *see also Moran v. Astrue*, 569 F.3d 108, 112 (2nd Cir. 2009). Other courts faced with this issue have arrived at a similar conclusion. *See e.g.*, *Farley v. Colvin*, 231 F. Supp. 3d 335, 339-41 (N.D. Cal. 2017)(collecting cases); *see also Cortes v. Berryhill*, No. 3:16-cv-01910 (JCH), 2018 WL 1392903, at *2-6 (D. Conn. March 19, 2018); *Peterson v. Comm'r of Soc. Sec.*, No. 16-2912, 2018 WL 953345, at *1 n.1 (D. N.J. Feb. 20, 2018); *Taylor-Tillotson v. Colvin*, No. 13-80907-CIV-WM, 2014 WL 7211888, at *13 (S.D. Fl. Dec. 18, 2014); *Mangan v. Colvin*, No. 12 C 7203, 2014 WL 4267496, at *1 (N.D. Ill. Aug. 28, 2014); *Gravel v. Barnhart*, 360 F. Supp. 2d 442, 452 n.24 (N.D.N.Y. 2005).

253 F.3d 1152, 1158 (9th Cir. 2005) (stating that the step two inquiry is a *de minimus* screening device to dispose of groundless claims) (quoting *Smolen v. Chater*, 80 F.3d 1273, 1290 (9th Cir. 1996)); *Webb v. Barnhart*, 433 F.3d 683, 687 (9th Cir. 2005) (step two is a "*de minimis* threshold"). To meet this low threshold, the claimant must provide evidence from acceptable medical sources to establish a medically determinable impairment. *See* 20 C.F.R. §§ 416.920(4)(ii), 416.921. A statement of symptoms, on its own, does not constitute sufficient evidence. *See* 42 USC § 423. Rather, claimants must produce "medical evidence consisting of signs, symptoms, and laboratory findings." *Id.* Importantly, "[d]iagnosis by a medical expert constitutes objective medical evidence of an impairment." *Savannah v. Astrue*, 252 Fed. App'x 783, 785 (9th Cir. 2007); *Rodriguez v. Bowen*, 876 F.2d 759, 762 (9th Cir. 1989) ("Disability may be proved by medically acceptable clinical diagnoses, as well as by objective laboratory findings.") (quoting *Day v. Weinberger*, 522 F.2d 1154, 1156 (9th Cir. 1975))); *cf. Cox v. Apfel*, 160 F.3d 1203, 1207 (8th Cir. 1998) ("Depression, diagnosed by a medical professional, is objective medical evidence of pain to the same extent as an X-ray film.") *and Buck v. Berryhill*, 869 F.3d 1040, 1049 (9th Cir. 2017) (noting that psychiatric diagnoses "will always depend in part on the patient's self-report," but this is "the nature or psychiatry" and is not a reason to dismiss a medical opinion).

Further, in social security proceedings, ALJs have "a special duty to fully and fairly develop the record and to assure that the claimant's interests are considered." *Brown v. Heckler*, 713 F.2d 441, 443 (9th Cir. 1983). Because SSA proceedings are inquisitorial rather than adversarial in nature, courts have repeatedly recognized the responsibility of ALJs to "investigate the facts and develop the arguments both for and against granting benefits." *Sims v. Apfel*, 530 U.S. 103 (2000); *see also Widmark v. Barnhart*, 454 F.3d 1063, 1068 (9th Cir. 2006). ALJs are not "mere umpire[s]" who passively assess the evidence presented to them. *Widmark*, 454 F.3d at 1068 (citing *Higbee v. Sullivan*, 975 F.2d 558, 561 (9th Cir. 1992)). Rather, an ALJ must "conscientiously probe into, inquire of, and explore all the relevant facts." *Id.* (citing *Cox v. Califano*, 587 F.2d 988, 991 (9th Cir. 1978)). If there is so much as an ambiguity in the evidence, or if the ALJ—or a reviewing court—finds that the record is inadequate for proper evaluation of

11

1    the evidence, such a finding triggers the ALJ's duty to conduct an appropriate inquiry. *See*

2    *Tonapetyan v. Halter*, 242 F.3d 1144 (9th Cir. 2001).

3          The ALJ's duty to develop the record is especially important when a claimant is

4    unrepresented, and that duty is further heightened where, as here, an unrepresented claimant raises

5    issues of mental impairment. *See id.* at 1150 (The ALJ's duty is heightened in all cases where a

6    claimant may be mentally ill and unable to adequately protect his or her own interests.) (citing

7    *Higbee*, 975 F.2d at 562); *see also DeLorme v. Sullivan*, 924 F.2d 841, 849 (9th Cir. 1990) ("In

8    cases of mental impairments, this duty [to develop the record] is especially important."); *Jones v.*

9    *Bowen*, 829 F.2d 524, 526 (5th Cir. 1987) (a claimant need only "raise a suspicion" about his or

10   her impairment in order to trigger the ALJ's duty to develop the record).

11         Accordingly, an ALJ must take reasonable steps to ensure that questions raised by medical

12   evidence are carefully addressed so that a determination of disability may be made, whether

13   favorable or unfavorable to the claimant, on a sufficient evidentiary record. *See Tidwell v. Apfel*,

14   161 F.3d 599, 602 (9th Cir. 1999); *see also Smolen*, 80 F.3d 1273, 1288 (9th Cir. 1996) ("If the

15   ALJ thought he needed to know the basis of [a doctor's] opinion[] in order to evaluate [it], he had

16   a duty to conduct an appropriate inquiry, for example, by subpoenaing the physician[] or

17   submitting further questions to [him or her]."). An ALJ may discharge their duty to develop the

18   record by, for example, subpoenaing records from or submitting questionnaires to the claimant's

19   physicians; extending or ordering a new hearing; or employing a new medical expert to examine

20   the record. *Tonapetyan*, 242 F.3d at 1150.

21         Illegibility of significant medical records is an ambiguity that triggers the ALJ's duty to

22   develop the record. *See Galloway v. Astrue*, No. EDCV 08-1248(CW), 2009 WL 1740647 at *4

23   (C.D. Cal. 2009) ("Where the medical records are crucial to the plaintiff's claim, illegibility of

24   important evidentiary material has been held to warrant a remand for clarification and

25   supplementation") (citing *Cutler v. Weinberger*, 516 F.2d 1282, 1285 (2d Cir. 1975)); *Williams v.*

26   *Colvin*, No. 15-cv-05352 JRC, 2015 WL 7018742, at *3 (W.D. Wash. 2015) (holding that an

27   ALJ's duty to develop the record is triggered where "the physician's documentation is illegible

28   and, therefore, inadequate to allow for proper evaluation of the medical evidence). Without taking

action to resolve ambiguities and gaps in the record, an ALJ cannot make a decision "supported by substantial evidence" as is required by the SSA.

Here, the ALJ disposed of Plaintiff's diagnoses of bipolar and schizoaffective disorders based solely on the testimony of Dr. Anderson. AR at 19. During his testimony, Dr. Anderson expressed concern regarding the lack of treatment records from 2002 to the present. *Id.* at 170-71. Dr. Anderson testified that he was unable to discern whether Plaintiff's "explosive anger" and "anxiety and withdrawal," persisted after Plaintiff left the Devereux Foundation in 2002. *Id.* at 171-72. Dr. Anderson further testified that he considered Plaintiff's multiple diagnoses of bipolar disorder and schizoaffective disorder but saw no evidence in the record of manic episodes, hallucinations, or other psychotic features, to support the diagnoses. *Id.* at 172-73, 183. Dr. Anderson stated that the medical records provided by Dr. Fisher, which included 20 pages of treatment notes from 2011 through 2014, were "totally illegible." *Id.* at 186. As such, Dr. Anderson did not include Dr. Fisher's clinical notes in his assessment of the record. *See id.* at 171, 186. Dr. Anderson further testified that the records from Dr. Brar, who treated Plaintiff from 2019 to the present, did not include treatment notes, which Dr. Anderson asserted would be "extremely important" to determining Plaintiff's current limitations due to his mental impairments. *See id.* at 171.

Dr. Anderson's testimony is contradicted by the record. Throughout the treatment record, Plaintiff's cycles of anger and depression have been variously described. Characterizations include "daily anger spells" after which Plaintiff would be "tearful and sleep for hours" (*Id.* at 48); "manic depressive disorder" (*Id.* at 57), "manic episodes in the form of rage attacks" (*Id.* at 71); "severe mood swings" (*Id.* at 1418); and records that "indicate…these periods represent manic episodes" (*Id.* at 1371). Thus, contrary to Dr. Anderson's testimony, several of Plaintiff's physicians have characterized his behavior as "manic episodes."

Similarly, the record includes evidence of hallucinations in at least three instances: *Id.* at 866 (1998 report noting Nicholas had "intermittent hallucinations"); *Id.* at 1417 (2005 report citing hallucinations as one of Nicholas's symptoms); *Id.* at 903 (2004 report noting that Nicholas had "no new problems" with his hallucinations and that "hallucinations/delusions[] are well

13

controlled."). In fact, the ALJ mentioned Plaintiff's history of hallucinations in her decision, and yet, at step-two, relied on Dr. Anderson's testimony as to the absence of hallucinations to find Plaintiff's schizoaffective disorder was not "medically determinable." *Compare id.* at 19 (stating that there is no evidence of hallucinations to support schizoaffective disorder diagnoses) *with id.* at 27 (acknowledging Plaintiff's history of hallucinations). Thus, Dr. Anderson's testimony that the record lacks evidence of hallucinations and manic episodes is inaccurate and cannot be said to constitute substantial evidence.

Further, by the court's most conservative count, Plaintiff was formally diagnosed with bipolar disorder four times and with schizoaffective disorder twice. *See e.g.*, AR at 56, 57, 81, 1399 (for bipolar diagnoses), AR at 893, 904 (for schizoaffective diagnoses). Several of Plaintiff's diagnoses are accompanied by clinical reports, detailing Plaintiff's signs, symptoms, and other clinical findings. *See e.g. id.* at 70-81, 873-92, 894-95. As the caselaw makes clear, diagnoses by an acceptable medical source constitutes objective medical evidence sufficient to establish a medically determinable impairment. *See Savannah*, 252 Fed. App'x at 785. Thus, the ALJ's dismissal of bipolar disorder and schizoaffective disorder at step two, for "lack of requisite evidence" was in error, as evidence of both disorders was present in the record.

The ALJ's error in dismissing Plaintiff's bipolar and schizoaffective disorders at step two was exacerbated by her failure to fully and fairly develop the record. The court acknowledges that there is ambiguity in Plaintiff's medical records as to whether his symptoms are best attributed to bipolar disorder, schizoaffective disorder, autism, dependent personality disorder, or some combination thereof. *See e.g.*, AR at 50-52. This ambiguity, however, does not empower the ALJ to pick one diagnoses over the other at step two. Rather, it triggers the ALJ's duty to develop the record. *See Tonapetyan*, 242 F.3d at 1150.

It is possible that the ALJ believed that Plaintiff's bipolar and schizoaffective disorders were misdiagnosed, and that autism more adequately accounts for Plaintiff's behavior. However, the ALJ did not, at step two, engage in any analysis of Plaintiff's competing diagnoses—if, indeed, they are in competition. As far as the court can tell, the ALJ disposed of Plaintiff's bipolar and schizoaffective diagnoses based solely on erroneous testimony and contrary to evidence of

14

both diagnoses, and their signs and symptoms, in Plaintiff's medical record. If the ALJ believed that she needed to know the basis of Plaintiff's multiple bipolar or schizoaffective disorder diagnoses in order to evaluate them, the ALJ had a duty to "conduct an appropriate inquiry, for example, by subpoenaing the physician[] or submitting further questions to [him or her]." *Smolen*, 80 F.3d 1273, 1288 (9th Cir. 1996).

The ALJ further failed to develop the record with respect to Dr. Fisher's treatment notes. Dr. Anderson testified that Dr. Fisher's 20 pages of clinical notes were "totally illegible." As discussed above, illegibility of significant medical records triggers an ALJ's duty to develop the record. *See Galloway*, 2009 WL 1740647, at *4. Dr. Fisher's report is significant—he was Plaintiff's treating physician for many of the years during the "gap" identified by Dr. Anderson and could likely shed light on both appropriate diagnoses for Plaintiff and the functional limitations of Plaintiff's phycological disorders. However, rather than seek clarification from Dr. Fisher, the ALJ simply didn't consider Dr. Fisher's treatment notes. Presumably, Dr. Fisher's diagnosis and the evidence supporting that diagnosis, are in his treatment notes—that they are illegible does not absolve the ALJ of her duty to inquire as to their contents. [5]

The ALJ's cursory dismissal of Plaintiff's bipolar and schizoaffective disorders at step two was premature. The step two analysis is a *de minimus* test, meant to weed out patently groundless claims and the most minor of impairments. It may be true that Plaintiff's symptoms are the solely the result of autism. It is equally possible that Plainttiff's symptoms are best attributed to autism and bipolar, together, or to bipolar alone. The court cannot say, for there is insufficient and conflicting evidence in the record. As such, the ALJ erred when she found that Plaintiff's bipolar and schizoaffective disorders were not "medically determinable" based solely on Dr. Anderson's inaccurate and incomplete review of the record.

---

[5] Dr. Fisher's exact diagnosis is unclear. Plaintiff and his father seem to be under the impression that Dr. Fisher was treating Plaintiff for bipolar disorder. *See e.g.*, AR at 183-86. Plaintiff's other medical records, including notes from his general practitioners, indicate that the medications prescribed by Dr. Fisher were for Plaintiff's bipolar disorder. *See e.g., id.* at 990, 1005. Regardless, Dr. Fisher's records are significant—they could potentially be the most thorough, detailed, and relevant records in Plaintiff's medical history—and yet, they were entirely disregarded by the ALJ.

These errors are not harmless. *See Stout v. Comm'r Soc. Sec.*, 454 F.3d 1050, 1055 (explaining that an error is harmless only if it is not prejudicial to the claimant or is otherwise inconsequential to the ALJ's ultimate non-disability determination). First, were the ALJ to properly develop the record and find that Plaintiff's bipolar or schizoaffective disorders were appropriately diagnosed, the ALJ would have had to consider listings 12.03 and 12.04 at step three. This analysis may alter the ALJ's ultimate decision of Plaintiff's non-disability, as neither listing 12.03 nor 12.04 were considered in the decision currently under review.

Further, the ALJ's failure to develop the record compounded when she calculated Plaintiff's RFC. As Dr. Anderson testified, he was unable to determine whether and to what extent Plaintiff's explosive behavior continues to affect his functioning because of the gap in Plaintiff's treatment record from 2002 to present. *See* AR at 170-71. The set of records most likely to remedy this paucity are those of his psychiatrists—Dr. Fisher and Dr. Brar—whose treatment, together, spans the years between 2011 and 2021. However, the ALJ did not seek clarification from either Dr. Fisher, on the contents of his illegible clinical notes, or Dr. Brar, whose brief statement of diagnoses and medications provided no information about Plaintiff's functioning. Instead, the ALJ concluded that Plaintiff's volatile behavior was well-controlled with medication.

To reach this conclusion, the ALJ relied heavily on Dr. Anderson's testimony, stating that Dr. Anderson's opinion was persuasive because it was based on a "review of all relevant medical evidence." AR at 26. The ALJ also stated that Dr. Anderson noted "improvement in [Plaintiff's] aggressive anger" which was "consistent with the record as a whole." *Id.* However, as the court has expounded, Dr. Anderson did not review all the relevant medical records—neither Dr. Fisher's treatment notes nor Dr. Brar's treatment records, which Dr. Anderson stated would be "extremely important" to determining Plaintiff's functioning, were available for Dr. Anderson's review. Further, although Dr. Anderson acknowledged that Plaintiff's symptoms appeared to improve due to medication and treatment, he was, by his own admission, unable to determine the extent of Plaintiff's improvement without further medical evidence. Thus, Dr. Anderson's testimony points to ambiguity, not clarity.

In short, the ALJ was presented with three significant ambiguities which triggered her duty

to develop the record: First, the ambiguity surrounding Plaintiff's diagnoses—that is, which diagnoses best account for Plaintiffs symptoms; second, the ambiguity presented by Dr. Fisher's illegible treatment notes; and third, the ambiguity presented by Dr. Anderson's stated inability to establish the extent to which Plaintiff's explosive behavior—regardless of whether that behavior is attributed to bipolar disorder, schizoaffective disorder, autism, or some other diagnoses—limits Plaintiff's functioning. Rather than further develop the record to dispel these ambiguities, the ALJ treated the ambiguities as proof of the absence of disability, disposing of bipolar and schizoaffective diagnoses at step two, dismissing Dr. Fisher's diagnosis and treatment notes, and assuming that Plaintiff's explosive behavior was remedied with medication.

Considering these unresolved questions, the court finds the record inadequate for proper evaluation of Plaintiff's mental impairments. As such, the ALJ's decision cannot be said to be supported by substantial evidence. Given the significant ambiguities present in this case, the court REMANDS for further proceedings. Plaintiff's request for remand for calculation of benefits is DENIED as the court finds that the record is not fully developed, and further administrative proceedings are necessary. On remand, the ALJ is ORDERED to resolve the ambiguity surrounding Plaintiff's multiple diagnoses as well as Plaintiff's functional limitations. The ALJ is ORDERED to request that Dr. Fisher clarify the contents of his treatment notes—either by testimony before the ALJ, by questionnaire, or by written (typed) summary. The ALJ is further ORDERED to subpoena records or testimony from Dr. Brar, seeking clarification of Plaintiff's current limitations due to his mental impairments. The ALJ may use any other means necessary to address the deficiencies of Plaintiff's treatment record, including ordering a consultative examination or an additional expert's review of the record.

//
//
//
//
//
//

**CONCLUSION**

Accordingly, Plaintiff's Motion for Summary Judgment (dkt. 20) is GRANTED in part and DENIED in part, Defendant's Cross-Motion for Summary Judgment (dkt. 21) is DENIED, and the case is remanded for further proceedings consistent with the findings and conclusions set forth herein.

**IT IS SO ORDERED.**

Dated: January 10, 2024

ROBERT M. ILLMAN
United States Magistrate Judge